UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF:

521 Pine Street, Apartment #309, Manchester, NH

Case No. _26-mj-108-01-TSM_

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Special Agent (SA) Eric Brimo being first duly sworn, hereby depose and state as follows:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since 2016. Prior to working for the ATF, I was a Special Agent with the U.S. Department of State, Diplomatic Security Service, since 2010. I am familiar with federal laws relating to firearms and violent crime, have been trained in the investigation of violations of said laws, and have participated in such investigations. During my law enforcement career, I have worked on numerous investigations involving unlawful firearm possession, violent crime, and firearm trafficking. I am familiar with both the Gun Control Act and National Firearms Act and analyze trends and patterns regarding criminal use of firearms as part of my official duties.

2.    I have received advanced training regarding firearms during my time with ATF. I am an ATF-designated expert in the interstate nexus of firearms, which is an advanced research methods program regarding the identification of firearms, locations firearms are manufactured, and general knowledge of procedures and history of the firearm industry. I am a certified Firearm

Verifier with the Royal Canadian Mounted Police (#QCPA-6521) and have received an

appointment as a Firearm Analyst from the Government of Canada. I am also the Project Safe

Neighborhood coordinator for the ATF Burlington Field Office where I conduct presentations

and trainings in the United States and Canada on criminal use of firearms and investigations

involving firearms.

3.      I make this Affidavit in support of an application pursuant to Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search 521 Pine Street, Apartment #309,

Manchester, NH (**Subject Premises**), further described in Attachment A, for the items and

information described in Attachment B.  This affidavit is based upon my personal knowledge;

my review of documents and other evidence; my conversations with other law enforcement

personnel to include members of the Montpelier Police Department (MPD), ATF Manchester

Field Office, and Homeland Security Investigations (HSI); and my training, experience and

advice received concerning the use of computers in criminal activity and the forensic analysis of

computers and electronically stored information ("ESI").  Because this affidavit is being

submitted for the limited purpose of establishing probable cause, it does not include all the facts

that I have learned during the course of the investigation.  Where the contents of documents and

the actions, statements, and conversations of others are reported herein, they are reported in

substance and in part, except where otherwise indicated.

## **PROBABLE CAUSE**

4.      On the afternoon of April 12, 2026, ATF Task Force Officer (TFO) Christopher

Quesnel advised me that the MPD received a report of a sex offense involving the use of a

firearm, which occurred in the City of Montpelier, Vermont. The complainant advised her 13-year-old daughter, hereinafter identified as "MV1", had disclosed sneaking out of their residence in central Vermont and being picked up by an individual later identified as Jared Marcus HUTCHINS, who MV1 had been communicating with via the Snapchat application on a cellular device. According to the complainant, MV1 engaged in sexual intercourse with HUTCHINS, and HUTCHINS had threatened MV1 and assaulted MV1 with a firearm to intimidate her from disclosing the incident.

### Interview with Complainant

5.      Based on law enforcement's conversations with complainant, MV1 disclosed she had been speaking with HUTCHINS, who resides in Manchester, New Hampshire, since around Christmas time in 2025, with communications typically occurring via SnapChat[1] and WhatsApp.[2] MV1 reportedly told HUTCHINS she was 17 years old but also disclosed to HUTCHINS that she was 13 years old. MV1 reportedly told the complainant that MV1 first met HUTCHINS in person on or about March 14, 2026, and they had sexual intercourse approximately three times since, the most recent event occurring on or about April 10, 2026.  In this most recent incident, MV1 disclosed to the complainant that MV1 engaged in sexual

---

[1]     Snapchat is a multimedia messaging application for mobile devices primarily used to share photos and videos—called "snaps"—that usually disappear after being viewed.

[2]     WhatsApp is a free, global, internet-based messaging and voice-over-IP (VoIP) service owned by Meta Platforms. It allows users to send texts, voice messages, share media/documents, and make voice/video calls worldwide without long-distance charges, using only a mobile device or desktop with an internet connection and a linked phone number.

3

intercourse with HUTCHINS and was assaulted by HUTCHINS in a nearby park. The next day, April 11, 2026, the complainant said MV1 slept in bed all day and claimed she had a "headache." Following MV1's disclosure, the complainant attributed this behavior to the interaction with HUTCHINS and the injuries she sustained during the assault.

**Interview with MV1**

6.      On or about April 15, 2026, law enforcement conducted a forensic interview of MV1, during which she confirmed information provided to law enforcement by the complainant. According to MV1, she met HUTCHINS via SnapChat and they communicated using SnapChat until HUTCHINS provided her with his phone number.  MV1 confirmed her age as 13 years old at the times of the events described in this affidavit.

7.      MV1 admitted to exchanging photos with HUTCHINS via SnapChat. MV1 also revealed that she had shared a video with HUTCHINS in which MV1 was engaged in masturbation because HUTCHINS had requested such a video. MV1 said she was nude in some photos she sent HUTCHINS, and HUTCHINS was nude in some photos he sent to MV1. MV1 identified a photo of HUTCHINS as the individual with whom she was having these communications and interactions.

8.      MV1 admitted that she had sexual encounters with HUTCHINS on approximately four different occasions starting on March 14, 2026, and the last one occurring on April 10, 2026.  In each case, MV1 and HUTCHINS engaged in communications using their mobile devices to meet with each other. In each case, MV1 and HUTCHINS engaged in sexual

4

intercourse and HUTCHINS traveled from New Hampshire to central Vermont, near MV1's residence to meet MV1 for these encounters.

9.    MV1 described the encounter on April 10, 2026. MV1 said that, during their encounter, HUTCHINS initiated sexual contact and she described sexual intercourse with HUTCHINS.  After this act, MV1 described that HUTCHINS accused her of having other male contacts on Snapchat. He forcibly took MV1's phone, searched through MV1's contacts, and became angry, hitting MV1 on the back of the head with MV1's phone. MV1 reported that each time he found something displeasing, he physically assaulted her. HUTCHINS threw her phone to the back of the car, ordered her to retrieve it barefoot, and when she could not find it, he found it himself and struck her again. MV1 described being choked to the point she could not breathe for approximately 30 seconds, and being struck in the face, though she is unsure whether it was a punch or a hit. HUTCHINS pushed her toward the open car door, then to the ground, while she repeatedly apologized. HUTCHINS yelled at her to get up, then brought her near a body of water, threatened to throw her in, and, when MV1 said she could not swim, MV1 told him he might as well shoot her to end her suffering quickly. HUTCHINS then brought her to the driver's side of his car, retrieved and loaded a black gun, and pinned MV1 to the car, hitting her on the back of the head with the gun multiple times and pointing it at her head as if to shoot her.

10.    After this, HUTCHINS ordered her back into the car and resumed searching MV1's phone, threatening further harm if he found anything else. She pleaded with him to stop, but he smashed MV1's phone against the gear shift and steering wheel, removing the case and screen protector. HUTCHINS stated he would stop only because he wanted to continue

5

communicating with her. HUTCHINS then pulled her hair, forced her head into his lap, and verbally abused her, calling her derogatory names. He attempted to rip out MV1's belly button piercing and stabbed MV1 in the stomach with a screwdriver, causing pain. HUTCHINS checked her body for bruises, made her put on his sweatshirt to conceal any marks, and explained that if bruises appeared, no one would notice.

11.     HUTCHINS told her he was taking MV1 to Manchester, New Hampshire and made threats involving HUTCHINS's girlfriend. While attempting to attach his license plate, HUTCHINS instructed MV1 not to touch her phone. When HUTCHINS failed to attach the plate, he set the GPS for Manchester, New Hampshire, and began driving at speeds that MV1 believed exceeding 100 mph, eventually realizing they were going the wrong way. HUTCHINS then returned to Montpelier and parked in a parking lot, where he attempted to fix his car but gave up. During periods between assaults, HUTCHINS would intermittently apologize, hug, or kiss MV1, then resume the abusive behavior.

12.     MV1 also stated that, after this encounter, she had written notes to herself in her cellular device about what happened and she provided consent for law enforcement to search phone.

**Manchester, NH Police Traffic Stop**

13.     A contemporaneous law enforcement encounter indicates that HUTCHINS possessed and carried a firearm at or around the time of the incidents described by MV1. According to a police report from Manchester, New Hampshire, on April 10, 2026, at approximately 6:48 p.m., HUTCHINS was encountered driving a white 2002 Mercedes Benz CL

without a front registration plate while wearing a ski mask that covered his face. A traffic stop was conducted where several shotgun shells were observed in the vehicle, and a handgun was found in a bag that HUTCHINS had on his person. Officers queried the firearm serial number of UG02130 and determined it was not stolen and, as HUTCHINS was not prohibited from possessing the firearm, it was returned to him. I obtained a screenshot from the Manchester Police Department body worn camera video from the traffic stop and, with the assistance of the ATF Manchester Field Office, was able to identify the firearm as a CZ P-10M 9x19mm semi-automatic pistol. I know this is a type of firearm that can be "racked" or loaded by a person in possession of it. I have also reviewed body camera video from this encounter and observed that when asked about his residence, HUTCHINS advised he lived on the "third floor." Based on additional information from the ATF Manchester Field Office, I am aware that the **Subject Premise**s is located on the third floor of the building.

### Disabled Vehicle

14.     Police reports also indicate that HUTCHINS was in Montpelier, Vermont on or about the date and time of the events described by MV1.  On April 11, 2026, at approximately 1:57 p.m., the MPD received a request to investigate a white Mercedes Benz bearing a New Hampshire registration plate which was in a place where it was not supposed to be along with a suspicious individual.

15.     Independently, prior to this tip, TFO Quesnel advised that two officers had checked on this vehicle, finding it was disabled. Officers communicated with HUTCHINS

during this encounter and HUTCHINS he said he was waiting on a friend to deliver him a part and was not in need of assistance.

**MV1 Phone Extraction and Examination**

16.    A review of MV1's phone was conducted on or about April 13, 2026.  This review revealed numerous messages exchanged between MV1 and an individual identified as "jared," between mid-February 2026 and April 12, 2026.  TFO Quesnel advised me that he found "jared" was listed as a contact in the phone directory and associated with the phone number ending in the digits 2776.

17.    TFO Quesnel advised me that HUTCHINS sent numerous messages of a sexual nature to MV1 on varying dates. On or about March 1, 2026, for example, HUTCHINS messaged MV1 to let her know his satisfaction from watching MV1 masturbate. In another exchange, dated March 29, 2026, HUTCHINS appears to reference a sexual encounter between the two, where HUTCHINS asks MV1 about her having an orgasm, despite MV1's apparent reluctance to answer him. On the same date, HUTCHINS told MV1 how he would p1ease her sexually, what sexual positions he would use, as well as telling MV1 that he, HUTCHINS, would ejaculate inside her vagina.

18.    On March 1, 2026, HUTCHINS and MV1 exchanged several messages regarding MV1 being 13 years old. In this exchange, HUTCHINS told MV1 that his girlfriend discovered messages between MV1 and HUTCHINS. HUTCHINS said that she claimed MV1 told her (HUTCHINS' girlfriend) that she was 13. This caused HUTCHINS to question MV1's age. During this interaction, MV1 denied being 13 and HUTCHINS responded in several comments

8

such as: *"Your fucking 13," "Your not fucking 17,"" You literally slipped up the other day and called  your sister your older sister,"* and *"Like if you are nd you sent me all those pictures nd stuff that's honestly more disgusting than what I did."* HUTCHINS also told MV1: *"But cool now you know Im a lying, narcissistic, manipulative fucked up evil piece of shit. So thats all you need to know I shoulda stopped texting you the first time she caught me texting you."*

19.     A review of MV1's phone also showed that MV1 sent HUTCHINS digital photographs of herself on various occasions via text message. MV1's physical appearance in these photographs did not indicate that MV1 was a 17-year-old female.

20.     A review of MV1's internet search history revealed various searches related to and corroborating MV1's descriptions of her encounters with HUTCHINS. On March 20, 2026, MV1 searched for: *"is a 13 and 22 year old 1egal in vermont."* On April 4, 2026, MV1 searched the internet for information about bleeding after intercourse and whether she could be impregnated.

21.     MV1's phone also revealed messages exchanged between HUTCHINS and MV1 on or about April 10, 2026, detailing their eventual meet up, with HUTCHINS driving to meet MV1. The messages revealed that MV1 would have to meet away from her home and avoid detection from her mother.

22.     On or about April 11, 2026, there were additional messages exchanged between the MV1 and HUTCHINS tending to corroborate the events of the prior evening.  In one exchange, HUTCHINS texted MV1:

> *"Baby I really just wanted to say that I am actually really sorry for yesterday Ik
> you probably don't believe that I am or feel that way but I truly am no matter*

*what you did I really shouldn't of ever hurt you like that at all and its lit my job to keep you safe and protect you and I went and did the complete opposite.*

23.     MV1 responded to HUTCHINS's message, telling him in part:

*"…what u did wasn't right like at all and im probably never gonna actually forgive u fully, that was honestly the worst night of my life…"* and *"…n next time u get THAT mad js hit me or sum shit bc all that rlly wasn't needed at all, js seemed like u wanted me scared enough so i wouldn't do what i did again.. AND TRUST ME IT WORKED."*

24.     In addition, MV1's phone revealed a note in the "notes" section of her phone in which she recorded photographs of her injuries and described the events of April 11, 2026.  It read:

*"it's april 11th, saturday around midnight time, i decided to sneak out for the third time to see the same guy. This time i knew it was a bad idea, i had only snuck out when no one was home other than my older sister and i….  He grabbed my phone after i handed it to him and started searching through it, after a min or two he starts yelling at me about past guys i've talked to then that's when it all happen.. He hit me with full force on the back of my head with my phone, then threw my phone in the back of the car. While yelling he tells me to gtfo of the car and find it, while i try i can't find it.. I tell him idk where it is and then he gets out of the car, comes over to where i am and hits me in the back of the head again, chokes me and i think he slapped my face too.. after that he pushed me hard to where i fell onto the ground, me crying on the ground he tells me to get up and makes me walk through the puddles near us. Where we were there's a river, lake thing that looks pretty deep, he picks me up and says "i should just throw you in there shouldn't i" i obviously say no and tell him i can't swim, whle trying to get out of his hands, it gets so bad i told him i'd do anything for him to just stop and id rather be shot. that's when he makes me stand outside of the driver seats door to the car. He sits in the driver seat and loaded his gun, stood up and pinned me against his car, and he put the gun to my head threatening to kill me. Then as i'm saying i'm sorry and i'll never tell anyone any of this happen he takes his gun and smashes it in the back of my head at least twice.. Yells at me to get back in the car and takes my phone again and starts smashing the shit out of it, begging him to stop he then threatens to rip my bellybutton ring out, he pulls it for a good min then stops, goes back on my phone and goes through it even more.. finds even more shit that pisses him off and grabs my hair pulls it hard towards him and does that for what felt like hours.. At this point im so dizzy idek if any of this was*

*even real, scared to death i ask him for a hug and kiss to try n calm him down, it does for a min then it goes back. During all this he even says "i think i should pistol whip u in the back of the head more huh?" i say no, and he says "i still feel like i should do more than just that" then he takes a screw driver and pushes it into my stomach, during this i was begging him to stop and i said sorry at least 20 times while all this was happening. . . . He ends up telling me he's not giving me my phone and he's gonna bring me back to manchester with him so his ex can beat the shit outta me, what he says is "if you think what i did was bad your in for a treat" or something along those lines. Then he says "you better not tell anyone bc even worse shit will happen to you if you do, and i hope yk i'll be able to bail out within hours if you end up telling someone" as that was said he got out of the car to try n put his front license plate on. Fails, gets back in the car lifts his arm and i flinch, he goes "you needa work on your flinching just in case i get pulled over" ofc im shaking and fucking scared so i tell him i love him and i won't tell anyone i promised him.*

25.    Accompanying the note were three digital photographs. The first, which appeared to be of MV1's stomach area, showed injury to below her belly button and belly button ring. The second, which appeared to be of MV1's legs, show injuries and bruising to both her knees and shins. The third photo, which was taken in a mirror, showed the shattered glass on the rear of MV1's phone.

### HUTCHINS Address and Arrest

26.    ATF Special Agents in Manchester, NH helped to identify HUTCHINS' white Mercedes Benz that was parked at the **Subject Premises**. ATF Manchester also interviewed the property manager of that address. The property manager stated that HUTCHINS resides in an apartment in that building at the **Subject Premises**.  The property manager told ATF that HUTCHINS provided a contact telephone number ending in the digits x2776.  The number matches the contact information for "jared" in MV1's phone.  Investigators with the ATF Manchester Field Office also determined the leaseholder for **Subject Premises** is an individual

11

with the initials C.M. TFO Quesnel advised me that during the investigation he determined that C.M. is the ex-girlfriend of HUTCHINS but they still lived together. Based on this context, I believe that C.M. was the same individual that communicated with MV1 about MV1's age and that HUTCHINS indicated confronted him about sexual encounters with MV1. For this reason, I believe that probative evidence related to HUTCHINS's criminal conduct is likely to be on C.M.'s electronic devices, likely to be located in the **Subject Premises**.

27.     On the late morning of April 16, 2026, an MPD officer, on patrol in the park where MV1 and HUTCHINS had their encounter in Montpelier, VT, noticed a white Mercedes Benz bearing New Hampshire car registration 5537415 parked in the parking lot. The officer noticed a male, who the officer recognized as HUTCHINS, walking around outside of the vehicle.

28.     At or around the same time, HUTCHINS called the MPD to report he was in the parking lot where he was looking for his wallet. HUTCHINS claimed, in his call, to have found a clear container containing white powder in it.

29.     Given the probable cause established in this affidavit, law enforcement from MPD responded to the park where HUTCHINS was and took him into custody without incident.

30.     HUTCHINS was wearing a black bag across his chest, which HUTCHINS admitted contained a CZ P-10M 9x19mm semi-automatic pistol. During processing, HUTCHINS identified his age as 22 years old and identified his phone number as the dialing digits ending in x2776.

31.     Based on conversations with other state and federal investigators on this case, I know that sexual intercourse between a 22-year-old and 13-year-old would be a violation of Vermont law, 13 V.S.A. § 3252(C).

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

32.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premise, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.     *Probable cause.*  I submit that if a computer or storage medium is found at the Subject Premise, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

13

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

14

cause to believe that this forensic electronic evidence will be on any storage medium in the

Subject Premise because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and

15

malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a

16

digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

35. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large

18

volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

36.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

37.     Based on the facts set forth herein, I believe that there is probable cause to believe that Jared Marcus HUTCHINS has engaged in enticement of a minor, in violation of 18 U.S.C. § 2422(b), and travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). (hereinafter "Subject Offenses") I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A for evidence of the Subject Offenses and seize the items described in Attachment B.

Respectfully submitted,

*s/ Eric Brimo*
Eric Brimo
Special Agent
Bureau of Alcohol Tobacco Firearms and
Explosives

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by telephone conference or video conference call on this _____16_____ day of ___April___, 2026.

_____
Talesha Saint-Marc
United States Magistrate Judge

20

## ATTACHMENT A

### Property to be searched

The premises to be searched (the "**Subject Premises**") is 521 Pine Street, Apartment

#309, in Manchester, New Hampshire. The premises to be searched is located in a multi-

apartment residential building and is shown in the following images taken on April 16, 2026:





**ATTACHMENT B**

**Items to Be Seized**

**A. Evidence, Fruits, and Instrumentalities of the Subject Offense**

The items to be seized from the Subject Premise are the following evidence, fruits, and/or instrumentalities for the violations of an individual engaged in enticement of a minor, in violation of 18 U.S.C. § 2422(b), and travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). (hereinafter "Subject Offenses") including:

1. Computer devices, storage media, cellular telephones, and related electronic equipment used to access, transmit, or store information relating to the Subject Offenses;

2. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from computer devices, storage media, and related electronic equipment;

3. Originals, copies, and negatives of visual or written depictions of minors engaged in sexually explicit conduct, related to Subject Offenses;

4. Correspondence and records pertaining to violation of the Subject Offenses including, but not limited to envelopes, letters, mailings, electronic mail, chat logs, electronic messages, books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions involving any visual depiction of minors engaged in sexually explicit conduct, related to Subject Offenses;

5. Records evidencing occupancy or ownership of the Subject Premises, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence;

6. Records or other items which evidence ownership, control, or use of, or access to computer devices, storage media, and related electronic equipment used to access, transmit, or store information relating to the Subject Offenses, including but not limited to sales receipts, warranties, bills for internet access, handwritten notes, registry entries, configuration files, saved usernames and passwords, user profiles, email contacts, and photographs.

7. Any child pornography as defined by 18 U.S.C. § 2256(8);

8. Notes, documents, records, invoices, or correspondence, in any format and medium, including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information, and handwritten notes, related to the Subject Offenses;

9. Firearms and ammunition; and

10. "Zip Ties", handcuffs, restraints or other devices used for the temporary detention of a person.

**B. Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises include any computer devices, storage media, and related electronic equipment that may contain or constitute fruits, evidence, and/or instrumentalities of the Subject Offense falling within the categories set forth in Section I.A above. In lieu of seizing any such computer devices, storage media, and related electronic equipment, this warrant also authorizes their copying for later review.

To facilitate this review, the items to be seized from the Subject Premises also include:

1. Any items or records needed to access the data stored on any seized or copied computer devices, storage media, and related electronic equipment, including but not limited to

any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.    Any items or records that may facilitate a forensic examination of any seized or copied computer devices, storage media, and related electronic equipment, including but not limited to any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.    Any records or other items which evidence ownership, control, or use of, or access to any seized or copied computer devices, storage media, and related electronic equipment, including but not limited to sales receipts, warranties, bills for internet access, handwritten notes, registry entries, configuration files, saved usernames and passwords, user profiles, email contacts, and photographs.

Any materials seized under this Section II.B that are later determined not to contain or constitute fruits, evidence, and/or instrumentalities of the Subject Offense falling within the categories set forth in Section II.A above will be returned to the Subject Premises within 60 days of their seizure.

### C. Use of Fingerprints and Face

During the execution of this search warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of BLUTO to the fingerprint sensor of any smartphones seized in connection with this warrant for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. During the execution of this search warrant, law enforcement personnel are authorized to have BLUTO remain still and look, with eyes open, at the camera of any smartphones seized in connection with this warrant for the

3

purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

### D. Review of ESI

Following seizure and/or copying of any computer devices, storage media, and related electronic equipment, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to Section II.A above.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related

4

to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II.A of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

5